IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

Vs.                                                                                         No.  06-40098-01-SAC

MAYNARD T. YATES,

        Defendant.

MEMORANDUM AND ORDER

The case comes before the court on the defendant's pretrial motion to suppress evidence found on February 1, 2006, in the search of a residence in Lawrence, Kansas. (Dk. 20). The government has filed a response opposing the motion. (Dk. 22). The parties presented evidence and oral argument in support of their positions on January 18, 2007 and again on January 25, 2007. Defendant then filed a supplement to his motion to suppress, and the government filed a reply. (Dk. 33; Dk. 37). Having reviewed all matters submitted and having researched the relevant law, the court is ready to rule on the motions.

INDICTMENT

The defendant Maynard T. Yates is charged in a single count indictment with violating 21 U.S.C. § 841(a)(1) on February 1, 2006, in the

District of Kansas, by possessing with the intent to distribute 48.83 grams of cocaine base.

FACTS

Before his arrest in this case, Yates had been a fugitive for nearly six years and was wanted on a warrant issued by the Kansas Department of Corrections ("KDOC") after he absconded from supervision in April of 2000 following his release from state prison in November of 1999. In early 2006, a fugitive task force involving state and federal agencies received information that Yates was living in Lawrence with his girlfriend, Lisa Brooks. As part of their efforts to locate and arrest Yates, the task force began surveillance of Brooks' home in Lawrence.

Brooks worked as a nurse in Topeka at Kansas Neurological Institute. On February 1, 2006, task force members observed Brooks' car parked at her work. They followed her as she left work and stopped at different places in Topeka and Lawrence. When it became clear that Brooks knew she was under surveillance, Officer James Galbraith, a Special Enforcement Officer with KDOC, initiated a traffic stop on Brooks' vehicle.

Officer Galbraith approached Brooks and asked her for

identification.  Galbraith asked Brooks whether Yates was living with her. Brooks initially denied that Yates was living with her in Lawrence and told Officer Galbraith that Yates was somewhere in Topeka.  Officer Galbraith then confronted Brooks with information he had received from an informant that Yates was staying at Brooks' home.  She continued to deny that Yates was living with her.  Officer Galbraith then informed Brooks that he knew Yates was in her home and advised her that she could be charged with aiding a fugitive if she was hiding Yates.  Officer Galbraith advised Brooks that he only wanted to apprehend Yates, and that he needed Brooks' assistance and consent to enter her home to arrest Yates.

During the course of their interaction, Officer Galbraith pointed out to Brooks that she "had a lot going on" and also "a lot to lose here." Brooks then became upset and started crying.  She indicated to Officer Galbraith that she did not want to go to jail or lose custody of the three children who were in the vehicle with her.  Officer Galbraith reassured Brooks that she was not the target of his investigative efforts, and that if she cooperated, she would not be arrested.  She then gave him oral consent to search her home, but demanded that Officer Galbraith put his promises in writing.  In an effort to allay Brooks' fears, Officer Galbraith

3

wrote on the back of one of his business cards, "I promise you will not be charged, you will keep your kids. [signature]." Brooks then accompanied officers to her house. Brooks testified that Offier Galbraith never explicitly threatened to remove her children. Officer Galbraith also never indicated to Brooks that he had the capacity to affect the custody of her children, nor did he threaten to arrest her if she failed to cooperate.

While the traffic stop was taking place, Yates was apprehended at Brooks' home trying to flee from the back door. After officers had Yates in custody but before they had obtained Brooks' consent, police conducted a "protective sweep" of Brooks' home. Shortly thereafter, Officer Galbraith and Brooks arrived at her home. Officer Galbraith then handed Brooks over to Special Agent Roger Bonner and left the scene with Yates.

Agent Bonner had been present at the traffic stop but did not interact with Brooks until she arrived at her home. Once Yates was gone, Agent Bonner asked Brooks for consent to search her house for other people, weapons, or drugs that Yates might have had with him. Brooks responded that she wanted the officers gone as quickly as possible, and Agent Bonner replied that her consent would help accomplish that because it would preclude the necessity of obtaining a warrant. At that point, Brooks

4

told officers, "Yes, you can search the house[, but] I want you out in fifteen minutes."  Agent Bonner had Brooks sign a consent to search form, and then officers completed a "very cursory sweep of the house."

The search turned up a Crown Royal bag, a razor blade, a set of scales, a cell phone, and a substance later determined to be approximately 48 grams of cocaine base.  Officers completed the search within the time constraints imposed by Brooks.  At no point during Brooks' interaction with Agent Bonner did the subjects of Brooks' arrest or her children arise.

RELEVANT LAW and ANALYSIS

The defendant seeks to suppress all evidence obtained directly or in derivation from the search of the Brooks home on February 1, 2006.  He raises three issues in his motion:  his standing to challenge the search of the Brooks home, the voluntariness of Brooks' consent, and the validity of the protective sweep.

Neither party contests Yates' standing to challenge the consent, therefore, this court finds that he has the standing he claims.  *United States v. Thomas*, 372 F.3d 1173, 1176 (10th Cir. 2004) (searches implicate the legitimate privacy interests of overnight social guests), and

*Minnesota v. Olsen*, 495 U.S. 91, 98, 110 S.Ct. 1684 (1990) (society recognizes that a houseguest has a reasonable legitimate expectation of privacy in his host's home). Because neither party offered evidence about a "protective sweep," the court has no evidentiary basis to consider the issue. Moreover, inquiry into the merits of the protective sweep is unnecessary because the resolution of the consent challenge is dispositive of Yates' motion. Therefore, the court limits itself to the issue of Brooks' consent.

## The Consent Challenge

Because it was conducted without a warrant, the search of Brooks' home is per se unreasonable under the Fourth Amendment unless the government can show that the search qualifies under a recognized exception. *United States v. Butler,* 966 F.2d 559, 562 (10th Cir. 1992). Consent is such an exception. *Id.* The government has the burden of proving valid consent to a warrantless search. *United States v. Cody,* 7 F.3d 1523, 1526 (10th Cir. 1993). In this circuit, there is a two-step test to determine whether the government has carried its burden. The government must (1) 'proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given' and (2) 'prove

6

that this consent was given without implied or express duress or coercion.'
*United States v. Sanchez,* 89 F.3d 715, 719 (10th Cir.1996).

As laid out in the court's fact findings, the government has shown that Brooks' consent was unequivocal, specific, and freely and intelligently given. Yates does not contest this showing, but instead focuses his challenge upon the coercive nature of Officer Galbraith's interaction with Ms. Brooks. Yates submits that Officer Galbraith threatened Brooks with the loss of her children if she refused to cooperate with police and thereby coerced her consent to search her home. While he admits that no explicit threats were made against Brooks or her children, Yates contends that Officer Galbraith "clearly communicated this idea" to Brooks by reminding her that she "had a lot to lose." According to Yates, this communication was sufficient to coerce Brooks' consent. Therefore, because Yates concedes the first step in the consent analysis, the court turns its attention to whether Ms. Brooks' consent was given without express or implied coercion.

When determining whether consent has been coerced, the court should not presume that consent was either voluntary or involuntary. *United States v. Soto,* 988 F.2d 1548, 1557 (10th Cir. 1993).

"[V]oluntariness is a question of fact to be determined from all the circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 248-49 (1973). The central question is whether "a reasonable person would believe he was free to leave or disregard the officer's request." *United States v. Manjarrez,* 348 F.3d 881, 885-86 (10th Cir. 2003).

Yates correctly states that in the D.C. Circuit, where "police coercion...is also a necessary predicate to the finding that a consent to search is not voluntary," the "particular personal traits or subjective state of mind of the defendant" may become "relevant only insofar as the police knowingly took advantage of the vulnerability in eliciting a consent to search." *United States v. Sims*, 428 F.3d 945, 953 n.2 (10th Cir. 2005) (quoting *United States v. Hall*, 969 F.2d 1102, 1108 n.6 (D.C. Cir. 1992)). However, in published Tenth Circuit case law, the application of a so-called "police perspective" test to consensual searches is an unresolved question, and the traditional *Schneckloth* totality of the circumstances test still applies. *Sims*, 428 F.3d at 953 n.2. Therefore, no one factor taken alone is dispositive because "a court must consider all the circumstances surrounding the encounter" to determine whether consent was voluntary. *Florida v. Bostick,* 501 U.S. 429, 439 (1991); *Sims*, 428 F.3d at 953 n.2.

Threats regarding pregnancy or separation from a child may be viewed as coercive, depending upon their operation under the totality of the circumstances. *Cf. United States v. Battle*, 117 F.Supp. 2d 1175, 1179-80 (D. Kan. 2000) (denying access to child to prevent hostage situation was not coercive) with *United States v. Alcarez-Mora*, 246 F. Supp. 2d 1146 (D. Kan. 2003) (*Mora*) (threatened removal of children and statement that defendant "will never see [his children] again" was coercive). However, it is only when officers make "direct and inexcusable" threats against a subject or her family that they implicate consent concerns. *Battle*, 117 F. Supp. 2d at 1180; *see also Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) (confession coerced where police and informant "surrounded" mother who had no previous experience with law enforcement and threatened to remove her child and cut off state financial aid for the child). Discussing the realistic penalties or results of refusing to cooperate does not render involuntary an otherwise-voluntary consent. *United States v. Ponce Munoz,* 150 F. Supp. 2d 1125, 1134-36 (D. Kan. 2001). In cases like the one at hand, coercion analysis does not turn on whether police action could have influenced a subject's decision because police may appropriately point out any number of self-interested reasons which may motivate a subject to comply with

9

police requests. *See Battle*, 117 F. Supp. 2d at 1180 ("any consent...involves some degree of influence or compulsion"). Instead, a court looks to whether police actually "threatened the welfare of [Brooks'] children and took advantage of her maternal instinct." *Id.* at 1180. Therefore, an officer's reference to likely legal consequences is a factor to be considered under *Schneckloth*, but, without more, such reference is not dispositive. *Ponce Munoz,* 150 F. Supp. 2d at 1134-36.

Under the totality of the circumstances in this case, Brooks' consent was not coerced. During her initial contact with police, she interacted with only Officer Galbraith. She did so in a public place, and Officer Galbraith never drew his weapon, nor did he separate Brooks from the children accompanying her. No evidence indicated that Officer Galbraith was anything but civil during the encounter. In fact, he actually protected Brooks from another officer present during the stop who Brooks testified was being real "hard" with her. Brooks became upset only after Officer Galbraith confronted her with his knowledge that she was lying to him and informed her that if she was hiding Yates, she could be charged with a crime.

While Officer Galbraith's words undoubtably influenced Brooks'

decision to cooperate, the only facts even suggesting coercion were Brooks' upset demeanor and her mention of her children.  Brooks testified that Officer Galbraith's comment that she had a lot to lose struck her as a reference to her children because, according to her testimony, Officer Galbraith had asked earlier whether she had a child with Yates.  The court, however, ascribes little weight to Brooks' current perceptions of Officer Galbraith's comments.  Officer Galbraith did not link his words to Brooks' children by gesture, glance, or any other indication.  Therefore, while Brooks' was free to subjectively draw whatever inferences she desired about the personal costs of being prosecuted for harboring a fugitive, the evidence does not establish that Officer Galbraith singled out her concerns for her children in order to pressure her consent.

A reasonable person in Brooks' situation would understand that she still had the option to persist in her deceit and run the risk of adverse legal consequences.  *Manjarrez,* 348 F.3d at 885-86.  That same reasonable person would also understand, however, that if she cooperated, she might be able to avoid those unpleasant consequences.  *Id.*  In any event, it is just as likely that Brooks was also acting out of self-interest, because Officer Galbraith's statements do not appear calculated to incite or

prey upon Brooks' maternal responsibilities. *Battle*, 117 F. Supp. 2d at 1179. Moreover, this one factor is not sufficient to outweigh the other indicators that Brooks was acting free from any coercion on the part of Officer Galbraith. *Schneckloth*, 412 U.S. at 248-49; *Bostick,* 501 U.S. at 439; *Sims*, 428 F.3d at 953 n.2.

Moreover, other facts undercut Brooks' assertion that Officer Galbraith was threatening her freedom or her children. Testimony from Officer Galbraith, Agent Bonner, and Brooks reveals that, while Officer Galbraith accurately informed Brooks that if she was hiding Yates, she could be charged with harboring a fugitive, no one ever threatened to arrest or imprison Brooks if she refused to cooperate. *Ponce Munoz,* 150 F. Supp. 2d at 1134-36. Further, Officer Galbraith never made any direct threats such as "you will never see your children again." *Mora*, 246 F. Supp. 2d at 1155. Also, no officer ever threatened to separate Brooks from her children if she failed to cooperate. *Lynumn*, 372 U.S. at 534; *cf. Ivy*, 165 F.3d at 402-04. The situation facing Brooks during the traffic stop clearly caused her anxiety and fear, but it is also clear that Officer Galbraith acted to allay her fears, not to incite and prey on them. *Battle*, 117 F. Supp. 2d at 1179. Moreover, instead of relying on the officer's oral promise

that she would be protected if she cooperated, Brooks displayed the fortitude and self-control to demand that Officer Galbraith reduce his promise to writing before she gave oral consent to search her home for Yates.

Yates's reliance on *United States v. Alcarez-Mora*, 246 F. Supp. 2d 1146 (D. Kan. 2003) (*Mora*), is misplaced because that case is factually distinct from the case at hand. In *Mora*, the police obtained a coerced confession from the defendant by threatening that he would "never see [his children] again" if he refused to cooperate. *Id*. at 1155. There is no evidence in this case that Officer Galbraith made a statement of comparable effect or breadth. Officer Galbraith merely informed Ms. Brooks of the lawful and likely consequences of her actions, and he did not threaten that she would "never see her children again." *Mora*, 246 F. Supp. 2d at 1154; *Ponce Munoz,* 150 F. Supp. 2d at 1134-36. Moreover, Officer Galbraith never indicated to Brooks that he had the power, authority, or intention to effect the consequence she feared. Therefore, *Mora* is distinct from this case and is of no help to Yates.

Yates also relies upon a Ninth Circuit case, *United States v. Tingle*, 658 F.2d 1332, 1336 (9th Cir. 1981), to support his proposition that

an inferred threat in this vein is the same as an explicit one.[1]  In *Tingle*, officers listed the penalties for failing to cooperate and made a definite statement that the defendant "would not see her child for a while." 658 F.2d at 1335-36. The officers' recitation of a "litany" of maximum penalties available for the charges facing the defendant and officers' statements that the defendant had "a lot at stake" and that she "would not see her child for a while" were sufficient for the Ninth Circuit to find that the officers had coerced the defendant's later cooperation by "prey[ing] upon [her] maternal instincts." *Id.* at 1336.

Yates' appeal to *Tingle* is unconvincing.  Officer Galbraith did not "single out" Ms. Brooks' maternal instincts and then "prey" upon them. *Tingle,* 658 F.2d at 1336.  The officer's comments did not exaggerate the consequences of Brooks' deceit, nor did they indicate what, if any, consequences might face her children if she persisted in her assistance to Yates.  Further, although Brooks might have faced two unappealing alternatives, given her demand for Officer Galbraith's written promise for protection, his quick assent to her demands, and his reassurance that she was not his target, Brooks' will was sufficiently intact to give Officer

---

[1] This court cited the *Tingle* case in *Mora*, 246 F. Supp. 2d at 1154, to support the outcome in that case.

Galbraith voluntary consent to search her home for Yates. *United States v. Moore*, 96 F. Supp. 2d 1154, 1160 (D. Colo. 2000).

The evidence further demonstrated that Brooks separately consented in writing to a later, abbreviated search of her home. Upon arriving at her home and finding Yates already under arrest, Agent Bonner approached Brooks with a new request to search her home, not for the defendant, but for drugs, weapons, or other dangerous persons who might be lurking in the house. Agent Bonner never discussed Brooks' children with her, nor did he indicate that she might be arrested if she failed to give him the consent he was seeking. The only consequence Agent Bonner discussed with Brooks was the necessity of obtaining a search warrant if she declined his request. The conversation between Brooks and Agent Bonner took place inside Brooks' house after Officer Galbraith had left the scene with Yates, and included none of Brooks' earlier concerns about her freedom or the custody of her children. Agent Bonner informed Brooks that he had a different goal in mind than Officer Galbraith had, and he informed her that her consent would assure the fastest resolution of his interest in searching her home. In fact, Brooks' written consent to search her home was the product of her desire to avoid further interaction with police while

they obtained a search warrant. The search was completed within the time limit Brooks dictated. Therefore, any lingering effects of Brooks' earlier interaction with Officer Galbraith were sufficiently attenuated that any of Galbraith's earlier comments posed no problem for Brooks' eventual consent to Agent Bonner.

Based on the foregoing discussion, the court finds that the government has carried its burden to show that Brooks' consent was given without any express or implied coercion. *Sanchez,* 89 F.3d at 719. The search was therefore reasonable because it was conducted under the consent exception to the Fourth Amendment's warrant requirement.

IT IS THEREFORE ORDERED that the defendant's motion to suppress (Dk. 20) should be and is hereby DENIED.

Dated this 23rd day of March, 2007, at Topeka, Kansas.

s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge